<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTT YOUNG,<br><br>*Plaintiff*,<br><br>v.<br><br>ICREDITWORKS INC. AND STEPHEN SWEENEY,<br><br>*Defendants*. | Civil No.: 24-cv-2122 (KSH) (CLW)<br><br><br><u>OPINION</u> |

**Katharine S. Hayden, U.S.D.J.**

**I.    Introduction**

Plaintiff Scott Young ("Young") has sued his former employer, defendant iCreditWorks Inc. ("iCreditWorks") and its founder and chairman, defendant Stephen Sweeney ("Sweeney," and with iCreditWorks, "defendants"), asserting contract, tort, and statutory wage claims. Defendants[1] have now moved to dismiss count II of the complaint, which alleges violation of the New Jersey Wage Payment Law ("NJWPL"), N.J.S.A. 34:11-4.1 to -4.15.  The motion is fully briefed and the Court decides it without oral argument.

**II.    Background**

The complaint alleges as follows.  ICreditWorks is "an early stage, financial technology company engaged in the business of mobile point-of-sale lending," which involves consumers making a purchase using a short-term loan, then paying off that loan in installments.  (D.E. 1, Compl. ¶¶ 6-7.)  The company "primarily operates in the dental industry," and its utility is such

---

[1] Count II is asserted against iCreditWorks, not against Sweeney.  However, the NJWPL makes officers and managers personally liable for violations.  *See* N.J.S.A. 34:11-4.1 (defining "employer" to include "the officers of a corporation and any agents having the management of such corporation"); *Musker v. Suuchi, Inc.*, 479 N.J. Super. 38, 43 (App. Div.), *lv. to appeal granted*, 258 N.J. 470 (2024).

that patients can handle the whole loan process while on their phones in the dental office's waiting room.  (*Id.* ¶ 8.)  Sweeney founded iCreditWorks in late 2017 or early 2018 and in February 2022 began recruiting Young, then an executive at Goldman Sachs' Marcus business, to be the chief executive officer of the company.  (*Id.* ¶¶ 6, 9-12.)  Sweeney made numerous representations to Young, a "known deal-maker in the industry" who had "deep expertise in financial technology companies," about iCreditWorks' funding, existing relationships with banks, commercial pipeline, and growth plans, and about his intent to "step away" from day-to-day operations.  (*See id.* ¶¶ 12, 14-21.)  Young accepted the position and entered into an employment agreement with iCreditWorks on March 24, 2022.  (*Id.* ¶ 27 & Ex. A.)  He began working for the company in June 2022 and soon after, he alleges, he discovered that Sweeney's representations about the business were false; Sweeney also refused to step back from day-to-day operations.  (*See id.* ¶¶ 43-62.)  The complaint sets forth in some detail the escalating friction caused by these developments, Young's efforts to resolve the situation, and the circumstances surrounding his departure from the company.

The events immediately preceding that departure are alleged to be as follows:  in February 2023, an employment contract for Sweeney that would "directly impact[] Young's role and responsibilities as CEO" was circulated at a meeting of the company's board of directors (*Id.* ¶¶ 79-80) and was apparently approved (*see id.* ¶ 85).  On March 14, 2023, Young sent Sweeney a resignation letter stating that he was invoking the "Good Reason" provision of his employment agreement and resigning, based on the board of directors' retention of Sweeney to do the same or similar job as Young, undermining his authority and "materially diminish[ing] his

2

authorities, duties, and responsibilities." (*Id.* ¶¶ 83-85.)[2] Sweeney "immediately" called Young, went on a "rant," and, within ten minutes, had Young's access to company systems and email deactivated. (*Id.* ¶¶ 88-89.) The following day, Sweeney held an "all-hands" meeting at the company, and told the audience that Young was no longer with the company and accused him of bringing a gun to work and taking the company's intellectual property. (*Id.* ¶¶ 90-93.) The day after that, March 16, 2023, the company's outside counsel sent Young a letter purporting to terminate his employment immediately and disagreeing with Young's invocation of the "Good Reason" provision of his employment agreement. (*Id.* ¶ 94.) To date, iCreditWorks has refused to make payments to Young that he asserts are required under his employment agreement, namely severance pay, reimbursement of COBRA payments, and payment for certain stock options. (*See id.* ¶¶ 96-104.) Also, "[a]t some point after March of 2023," without notifying Young, the company cancelled all of his stock options, including options that vested upon grant and those that vested upon termination. (*Id.* ¶ 103.)

On March 8, 2024, Young filed a six-count complaint against iCreditWorks and Sweeney based on the above sequence of events. The first four claims are asserted against iCreditWorks only: count I, for breach of contract; count II, for violation of the NJWPL;[3] count III, for conversion; and count IV, for unjust enrichment. The remaining two claims are against

---

[2] The agreement lists multiple ways in which Young's employment with iCreditWorks could terminate, one of which is "Executive's resignation for Good Reason." (Compl., Ex. A ¶ 4.E.) "Good Reason" is defined in an exhibit to the agreement to include scenarios where "the Company, without Executive's written consent, . . . materially reduces Executive's the current title, authority, reporting line, duties or responsibilities." (Compl., Ex. A, Exhibit A: Definitions § B.) The ground for termination affects the amounts and categories of payment that Young is entitled to under paragraph 5 of the employment agreement. (*Compare* Compl., Ex. A ¶ 5.A (company's post-termination obligations in event of termination for any reason other than for Good Reason or without Cause) *with* ¶ 5.B (company's post-termination obligations in event of termination for Good Reason or without Cause).)

[3] *But see supra* n.1.

3

iCreditWorks and Sweeney: count V, for fraud in the inducement, and count VI, for defamation.

ICreditWorks has moved to dismiss count II on the basis that the type of payments Young alleges were withheld from him are "explicitly excluded . . . from the [NJ]WPL's definition of 'wages.'" (D.E. 6-1, Moving Br. 1; *see also* D.E. 12, Reply.) Young counters that all three categories at issue here – severance pay, COBRA reimbursement, and his stock options – fall within the statutory definition of "wages" under the circumstances because, in short, they were promised in advance of Young rendering services and he earned them as he worked. (D.E. 11, Opp.)

### III. Standard of Review

To withstand dismissal under Fed. R. Civ. P. 12(b)(6), a complaint must plead a plausible claim for relief, which means the plaintiff has pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Curley v. Monmouth Cnty. Bd. of Chosen Freeholders*, 816 F. App'x 670, 674 (3d Cir. 2020) (quoting *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017)). At this stage, the Court accepts as true the factual allegations, considers them in the light most favorable to plaintiff, and "'disregard[s] legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016)).

The scope of the Court's review is limited to "the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

IV. Discussion

The NJWPL "'governs the time and mode of payment of wages due to employees,' and is a remedial statute to be construed liberally." *Maia v. IEW Constr. Grp.*, 257 N.J. 330, 344 (2024) (quoting *Hargrove v. Sleepy's*, LLC, 220 N.J. 289, 302-03 (2015)). It is designed to "protect employees' wages and to assure timely and predictable payment," as well as to "guarantee receipt of the fruits of their labor." *Musker*, 479 N.J. Super. at 42 (citations omitted).

Under N.J.S.A. 34:11-4.2, which addresses the timing and mode requirements for wage payment, employers generally must pay employees their full wages twice monthly. Upon an employee's termination, the employer must "pay the employee all wages due not later than the regular payday for the pay period during which the employee's termination, suspension or cessation of employment . . . took place, . . . or in the case of employees compensated in part or in full by an incentive system, a reasonable approximation of all wages due, until the exact amounts due can be computed[.]" N.J.S.A. 34:11-4.3. If an employer fails to pay wages as required by the statute, an employee may recover in a civil action the "full amount" of unpaid wages due, plus liquidated damages of up to 200 percent of the wages due, along with costs and reasonable attorney's fees as allowed by the Court. N.J.S.A. 34:11-4.10(c).

The motion before the Court turns on the scope of "wages" under the statute. The NJWPL defines "wages" as follows:

> the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto.

N.J.S.A. 34:11-4.1(c).

What Young seeks under this statute derives from provisions in his employment agreement. The stock options listed were among the categories of compensation and benefits

5

granted Young, along with an annual salary, a discretionary bonus, and other items. (Compl., Ex. A, ¶ 3.) The options were characterized, unlike the salary and bonus, as "incentive" options, but their vesting was not linked to any performance benchmarks: a portion vested upon grant, and the rest on a vesting schedule. (*Id.* ¶ 3.C.i.) Treatment of the options was also addressed in paragraph 5, on the company's post-termination obligations; this paragraph is also the source of the severance and COBRA reimbursements to which Young claims entitlement:

> If this Agreement is terminated by Executive for Good Reason . . . , the Company shall pay or provide Executive all Accrued Compensation and Accrued Benefits[4] to which he is entitled. Further, the Company shall (I) make severance payments to Executive equal, in aggregate, to (a) if the termination occurs during calendar year 2022, three months of Executive's salary, (b) if the termination occurs during calendar year 2023, six months of Executive's salary or (c) if the termination occurs during calendar year 2024 or thereafter, nine months of Executive's salary and (II) shall pay Executive for the cost of COBRA coverage for the same number of months for which it is obligated to pay severance pursuant to clause (I) (payments under this sentence "Severance Payments"). In addition, all Liquidity Options [as defined in ¶ 3.C] that have not previously vested shall become immediately fully vested. Further, in the Company's reasonable discretion, it shall pay Executive a *pro rata* Bonus for the year in which such termination occurs . . . , payable at the same time bonuses are otherwise paid for such year. Severance Payments and COBRA cost payments shall be paid in equal monthly installments in accordance with the Company's payroll practices, starting on the first Company payroll date that is at least 60 days (with the first payment containing all amounts which should have been, but were not, paid prior to such date) after the date of termination (the "Initial Payment Date") and provided that Executive has complied with the Conditions set forth below as of the Initial Payment Date. . . . .

---

[4] "Accrued Compensation" is defined in the preceding paragraph as "all unpaid salary accrued through the date of termination and any Bonus, to the extent unpaid, in respect of any prior year . . . , as well as all unreimbursed business expenses and healthcare premiums." "Accrued Benefits" is also defined in that paragraph, in this sentence: "The Company shall have no other obligations to Executive under this Agreement, any Company policy or otherwise, except as otherwise provided under the Plan [as defined in ¶ 3.C.i] with respect to the Options (and with respect to the Options, as provided in Section 3.C), or any other equity awards, or with respect to any compensation or benefit plan that specifically provides for any post-termination benefit (the 'Accrued Benefits')." (*Id.* ¶ 5.A.)

(Compl., Ex. A, ¶ 5.B.) The "Conditions" included a requirement that Young execute a release of claims in the form attached to the employment agreement. (*Id.*, Ex. A, ¶ 5.D & Exhibit C.)

Relying on various state and federal decisions, defendants argue that "wages" under N.J.S.A. 34:11-4.1(c) comprise only what is earned before termination and not supplementary incentives, and that what Young seeks are post-termination amounts, or supplementary incentives. Young, on the other hand, argues that all three categories he seeks involve non-discretionary entitlements granted to him in the employment agreement that were not incentive-based and were forms of compensation earned in exchange for his services. He notes that what he claims he is owed by way of severance and COBRA payment is based on the amount of time he worked for the company (*e.g.*, if termination occurred in 2022, three months of severance pay and COBRA; in 2023, six months of each).

The statutory definition of wages does, by its plain language, draw a line between direct monetary compensation for services, and supplementary incentive-based payments, and this distinction animates the parties' arguments. But this is not the only line drawn by the statute. As they seek to fit the statutory terms to the scenario here, both sides have pointed only to federal district court opinions or to unpublished decisions of the New Jersey Supreme Court, Appellate Division. Neither offers published Appellate Division or New Jersey Supreme Court authority specifically addressing the definition of "wages" within the meaning of the NJWPL.

A federal court sitting in diversity, as this Court does here, applies state substantive law. *Hargrove v. Sleepy's*, 612 F. App'x 116, 118 (3d Cir. 2015); *Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 302 (3d Cir. 2012). Thus, if the New Jersey Supreme Court has spoken on a question of New Jersey law, this Court is bound by its decision; this is illustrated by *Hargrove*, 612 F. App'x at 118, another case

7

involving the NJWPL. There, the Third Circuit had certified a question to the New Jersey Supreme Court concerning the appropriate test to be used under this and another New Jersey wage statute to determine employee versus independent contractor status. The New Jersey Supreme Court accepted certification and decided the question. When the case returned to the Third Circuit's active docket, the panel acknowledged that under *Erie*,[5] "federal courts in this Circuit must now apply the decision of the New Jersey Supreme Court . . . to these questions" about employee/independent contractor status. *Id.*

If the relevant question has not been addressed by the state's highest court, this Court is tasked with predicting how that court would rule. *Holmes v. Kimco Realty Corp.*, 598 F.3d 115, 118 (3d Cir. 2010). That may include giving "serious consideration" to, among other sources, intermediate appellate courts' rulings. *Id.* (quoting *Aetna Cas. & Sur. Co. v. Farrell*, 855 F.2d 146, 148 (3d Cir. 1988)). It is not, however, the role of a federal court to "lead the state courts in the interpretation of state law." *Hudson v. Eaglemark Sav. Bank*, 475 F. App'x 423, 426 (3d Cir. 2012) (quoting *Manning v. Princeton Consumer Discount Co.*, 380 F. Supp. 116, 120 (E.D. Pa. 1974)).

While the decisional law the parties have cited may ultimately prove instructive, the Court notes that after the briefing closed on this motion the Appellate Division issued *Musker*, 479 N.J. Super. 38, which considered whether a particular commission structure constituted "wages," as opposed to "supplementary incentives," under the NJWPL In a published decision that recognized the dearth of binding authority on the issue,[6] the Appellate Division undertook a

---

[5] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[6] *See* 479 N.J. Super. at 59 ("To date, no published New Jersey opinions have resolved this thorny definitional issue concerning sales commissions and supplementary incentives."); *id.* at 59 n.14 (noting that several unpublished opinions have sought to do so "with varying approaches and results," but declining to cite them under N.J. Ct. R. 1:36-3, which provides that "No

8

painstaking analysis of N.J.S.A. 34:11-4.1, which it read as having several discrete, conjunctive requirements: the "direct monetary compensation for labor or services rendered by an employee," "where the amount is determined on a time, task, piece, or commission basis," "excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto."  Writing for the panel, Judge Sabatino analyzed each of these subparts and its application to the commission structure at issue there.  "Direct monetary compensation," for example, reaches "only monetary compensation that is directly due and payable to an employee for the labor or services provided," and which is to be paid with money, as opposed to "some other form of compensation such as stock options or the use of a company car"; "supplementary incentive" means "additional compensation or perks that can motivate employees to take action beneficial to the employer, above and beyond the monetary payments directly owed to them for their labor or services," and so on.  *Id.* at 54, 58.

Ultimately, the conclusion was that the commissions sought were not "wages" within the meaning of the NJWPL; they were "supplementary incentives." *Id.* at 63.  In September 2024, the New Jersey Supreme Court granted leave to appeal.  258 N.J. 470.  As of this writing, oral argument had not yet been scheduled.

An initial review of the Appellate Division's ruling—which the parties have not brought to the Court's attention; consequently, they have not addressed its impact on this case— indicates support for both sides' positions.  *Musker*, as the only published New Jersey appellate decision directly interpreting the "wages" definition in the NJWPL that the Court is aware of,

---

unpublished opinion shall constitute precedent or be binding upon any court," and sharply restricts the citation of such opinions); *id.* at 60-61 (noting that it was not bound by District of New Jersey's legal analysis in a similar case "because the interpretation of the New Jersey law and, specifically, the Wage Payment Law, is a question to be resolved definitively by our state courts and not by a federal court exercising its diversity jurisdiction").

plays an important part in predicting how the New Jersey Supreme Court would rule in these circumstances. *See Holmes*, 598 F.3d at 118. Given the fortuitous scenario that the decision is presently under review by the New Jersey Supreme Court, the Court will refrain from making predictions or requiring the parties to weigh in at this juncture. As defendants have repeatedly argued, this case will go on regardless of how this motion is ultimately decided, inasmuch as it was brought as an effort to pave the way for "the real dispute," which in defendants' view is the breach of contract claim. (D.E. 12, Reply Br. 11; *see also* D.E. 6-1, Moving Br. 8.) The motion to dismiss is therefore denied without prejudice to renewal, if warranted, after the New Jersey Supreme Court rules on the appeal pending before it in *Musker*.[7]

## V.     Conclusion

The motion to dismiss count II is denied without prejudice. An appropriate order will issue.

Date: December 27, 2024

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

!

---

[7] Defendants' alternative argument that the payments, even if "wages," were not "due" because Young did not sign a release as required by the employment agreement, relies on facts outside the pleading (*e.g.*, whether a release was signed, and/or whether there were grounds to relieve Young of that requirement) and is not a ground for independently granting this motion notwithstanding *Musker*.